**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ERICA JANE McELROY** : | | **CIVIL ACTION** |
|       **Plaintiff,** : | | |
| : | | |
| v. : | | |
| : | | **NO. 15-3074** |
| **CAROLYN W. COLVIN,** : | | |
| **Acting Commissioner of** : | | |
| **Social Security,** : | | |
|       **Defendant.** : | | |

**REPORT AND RECOMMENDATION**

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                                          September 21, 2016

      Plaintiff, Erica Jane McElroy, brought this counseled action pursuant to 42 U.S.C. § 405(g), seeking review of the Commissioner of the Social Security Administration's decision denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and 1381–1383, (the "Act"). The matter is before the Court for a Report and Recommendation. For the reasons set forth below, I respectfully **RECOMMEND** that Plaintiff's request for review be **GRANTED** and the matter be remanded for proceedings consistent herewith.

**I.     PROCEDURAL HISTORY**

      Plaintiff was born on July 29, 1978, and was thirty-five years old as of the date of the decision denying her application for SSI benefits. (R. 44, 216). Plaintiff, a high school graduate, has a nurse's aide certification. (*Id.*). Her past relevant work includes a "cashier/deli worker/stocker," and a nurse's aide. (R. 32, 44-45).

Plaintiff protectively filed for DIB and SSI on January 19, 2012, alleging disability since May, 15, 2012. (R. 25, 183-85, 188-91). Plaintiff's applications were initially denied on August 8, 2012. (R. 121-30). On October 2, 2012, she requested an administrative hearing before an administrative law judge ("ALJ"), which occurred on October 23, 2012. (R. 131-32, 43-79). Plaintiff, represented by an attorney, and a vocational expert ("VE"), appeared and testified. (R. 43-79). On November 15, 2013, the ALJ issued a decision finding Plaintiff not disabled and not entitled to benefits under the Act. (R. 25-34). Plaintiff's December 6, 2013, request for review with the Appeals Council was denied on April 2, 2015, (R. 20, 1-6), thereby making the ALJ's decision the final decision of the Commissioner.[1] Plaintiff subsequently filed this action to appeal the Commissioner's decision. (Compl., ECF No. 1; Pl's Br., ECF No. 9). The Commissioner has filed a Response, (Resp., ECF No. 10).

The matter has been referred to me for a Report and Recommendation.[2] (Order, ECF No. 11).

## II.     FACTUAL BACKGROUND[3]

---

[1] Plaintiff submitted two additional pages of medical evidence to the Appeals Council with her request for review. (R. 6, 841-42). Plaintiff does not rely on these additional notes here, and concedes that the Court can only consider whether the ALJ's decision is supported by substantial evidence on the basis of the record as it existed at the time the ALJ rendered his decision. (Pl.'s Br. 2 fn.2, ECF No. 9); *see also* (R. 24, 35-40) (list of evidence in the record at time of ALJ decision).

[2] This case originally was assigned to the Honorable L. Felipe Restrepo, and later was reassigned to the Honorable Edward G. Smith. (Order, ECF No. 12).

[3] Plaintiff claims inability to work due to both physical and mental impairments. Other than mentioning in a footnote the alleged failure of the ALJ to address her fibromyalgia, Plaintiff has not raised any issues as to the ALJ's conclusions regarding her physical impairments. (Pl.'s Br. 4 n.4). Plaintiff's request for review focuses only on the ALJ's findings with regard to her mental impairments. Accordingly, the Court's recitation of the evidence focuses on those impairments.

In April 2012, Plaintiff was evaluated at the Lehigh Valley Mental Health Centers, hereinafter "LVMHC." (R. 407-27). She complained of daily panic attacks that prevented her from keeping a job, constant crying, racing thoughts, hearing voices/buzzing, uncontrolled anger, and a desire to cut herself. (R. 408). Her reported past mental health history included two hospitalizations for suicidal and homicidal thoughts, and a history of outpatient treatment for psychiatric illnesses. (R. 337-72, 407-27, 460-62, 469-76, 582-613, 703-27, 778-806).

### A.   Treating Psychiatrist - Enrique Lirag, M.D.

Plaintiff began treatment with psychiatrist Enrique Lirag, M.D. at the LVMHC in April of 2012. At her initial evaluation, Plaintiff presented as anxious, irritable and depressed. (R. 423). Dr. Lirag diagnosed Plaintiff with, *inter alia*, panic disorder with agoraphobia and bipolar disorder, mixed, severe, without psychotic features. (R. 424). He assigned her a Global Assessment Functioning, ("GAF"), score of 50.[4] (*Id.*).

Between April 29, 2012, and June 10, 2013, Plaintiff saw Dr. Lirag thirteen times. (778-806). She consistently reported feeling anxious, moody, angry and depressed. (*Id.*). She experienced manic episodes and sleep disturbances, once "staying up for a week" while another time sleeping for 36 hours. (*Id*). Throughout this time, Dr. Lirag tried a variety of medications to address Plaintiff's symptoms including, but not limited to, Saphris, Lithium, Abilify, Xanax, and Elavil. (*Id.*).

---

[4] A GAF score is a "numerical summary of a clinician's judgment of [an] individual's overall level of functioning." *Rivera v. Astrue,* No. 12–6622, 2014 WL 1281136, at *7 (E.D. Pa. Mar. 27, 2014) (quoting *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000)). A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. *Garcia v. Colvin*, No. 3:15-CV-0171, 2016 WL 1695104, at *4 n.8 (M.D. Pa. Apr. 26, 2016) (citing *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 2000)). A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. *Garcia*, 2016 WL 1695104, at *4 n.8 (citing *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 2000)).

On April 24, 2013, Dr. Lirag re-evaluated Plaintiff.  Her psychiatric medications at the time included Abilify, Xanax and Vyvanse.  Plaintiff was cooperative, friendly, attentive and restless but "had trouble focusing."  (R. 779).  Her mood was anxious, irritable, depressed, and labile.  (R. 780).  Her thought process and content was characterized by low self-esteem and depressive thoughts.  (*Id.*)  Dr. Lirag noted that Plaintiff had missed several visits.  She attributed her no-shows to an unwillingness to leave her house; she became "panicky" when she went outside.  She reported always feeling rage.  She could be set off by little things.  According to Plaintiff, she needed to stay away from people to avoid panic attacks and to keep from getting into fights.  Dr. Lirag diagnosed Plaintiff with bipolar disorder, mixed, severe without psychotic features, panic disorder with agoraphobia, and assessed a GAF score of 50.  (R. 781).

On June 18, 2013, Dr. Lirag completed a medical source statement, a Psychiatric Impairment Questionnaire.  He diagnosed Plaintiff with bipolar disorder and panic disorder with agoraphobia; assessed a GAF score of 50; and opined that her prognosis was guarded.  (R. 799, 806).  Dr. Lirag identified the following positive clinical findings: poor memory, sleep disturbance, mood disturbance, social withdrawal or isolation, emotional lability, decreased energy, manic syndrome, pervasive loss of interest, psychomotor agitation, generalized persistent anxiety, feelings of guilt/worthlessness, difficulty thinking or concentrating, hostility and irritability.  (R. 800).  Plaintiff was taking Tegretol and Xanax at the time of the June 18, 2013, evaluation.  (R. 804).

Dr. Lirag opined that Plaintiff was moderately limited in her ability to: (1) remember locations and work-like procedures; (2) understand, remember, and carry out one or two step instructions; (3) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; (4) sustain ordinary routine without supervision; (5) make simple work-related decisions; (6) accept instructions and respond appropriately to criticism

4

from supervisors; and (7) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  He assessed marked limitation in her ability to: (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) work in coordination with or proximity to others without being distracted by them; (4) complete a normal workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (5) interact appropriately with the general public; (6) get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and (7) respond appropriately to changes in the work setting.  (R. 801-804).

Finally, Dr. Lirag explained that Plaintiff's coping strategy is to "withdraw rather than engage in confrontation for fear she might seriously hurt somebody."  (R. 804).  He noted her impairments were ongoing and expected to last at least twelve months, and opined that labile mood and low frustration tolerance make her incapable of tolerating even low work stress.  Dr. Lirag further opined that Plaintiff would expected to be absent from work more than three times per month, adding that she "panics easily."  (R. 806).  Plaintiff's explosive outbursts were managed by restricting herself to home and avoiding crowds.  (R. 805-06).

**B.     State Agency Psychological Consultant – Dennis C. Gold, Ph.D**

On July 2, 2012, Dennis C. Gold, Ph.D., an evaluating but non-examining medical source, completed two forms as part of Plaintiff's initial disability determination: a Psychiatric Review Technique ("PRT") form, and a Mental Residual Functional Capacity Assessment ("MRFCA") form. (R. 94-95, 98-100).  On the PRT form, Dr. Gold opined that Plaintiff's affective disorder, anxiety disorder, and substance addiction disorder imposed mild restrictions in activities of daily living, moderate difficulties in ability to maintain social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  Dr. Gold added that

5

Plaintiff previously had one or two episodes of decompensation, each of extended duration. (R. 94). The most recent hospitalization occurred in August 2006 at the Pottsville Hospital. (R. 95). Dr. Gold concluded that the section (B) criteria of Listing 12.04 (Affective Disorders), 12.06 (Anxiety – Related Disorders) and 12.09 (Substance Addition Disorders) were not satisfied. (R. 94). He also found that the evidence did not show that Plaintiff met the section (C) criteria for those listings. (*Id*). In making this determination, Dr. Gold explained that Plaintiff appeared coherent with no problems understanding, talking or answering questions at her face-to-face April 20, 2012, Disability field office interview. (R. 95). He also noted "no psych inpt. since 2006." (*Id*.).

On the MRFCA form, Dr. Gold opined that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, complete a normal workday and workweek, without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and set realistic goals or make plans independently. Dr. Gold found Plaintiff was markedly limited in her ability to understand, remember, and carry out detailed instructions, but concluded that she was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations from her impairment." (R. 98-100).

### C. Lay Opinion Evidence

Plaintiff completed a "Function Report-Adult" on May 2, 2012. (R. 223-231). In that Report, Plaintiff stated that she experienced daily panic attacks and "flashbacks" and "very unpredictable" mood swings. (R. 224). She described being up for days at a time in a "manic phase," then "crash[ing]" and sleeping for several days. (*Id*.). She had no control over her

bipolar or panic attacks. (R. 224-25). In terms of her activities of daily living, Plaintiff stated she would get up, take her daughter to school, come home, and go back to bed. On a good day, Plaintiff claimed she would read or try to clean the house. (R. 225). Plaintiff stated she required written reminders or alarms to take her medication and pay bills. (R. 226-27). She could prepare a meal a few times a week, load the dishwasher, and start the laundry. (R. 226). She would go outside only when necessary because "being outside in open space scares [her]," could drive within a mile of her home, and grocery shop once a month. (R. 227). Plaintiff stated that she had problems getting along with family, friends and neighbors because she had no control over her anger and aggression, talked too loudly, started fights and got violent at times. (R. 229). With regard to work-related mental abilities, Plaintiff indicated she had difficulty with memory, completing tasks, concentration, and getting along with others. (*Id*.). She stated that she could not finish tasks, follow spoken instructions, ("I need to be told a few times for it to sink in [and] even then I need reminders."), handle changes in routine, (R. 229-30), or get along with authority figures. (R. 229-30). She could follow written instructions "pretty well." (Id.). Plaintiff stated that she did not handle stress well and would "cry," "shut down," or have "panic attacks." (R. 230).

Plaintiff's husband, Justin McElroy, submitted an Adult Third-Party Function Report on May 7, 2012. (R. 235-42). McElroy confirmed that Plaintiff suffered from panic attacks, cries often, and easily becomes angry. (R. 235, 241). He stated that Plaintiff talks too loudly for others and cannot stay on track or focused. (R. 240). She would be able to follow written instructions but would have difficulty understanding and following spoken instructions, and would be unable to pay attention for any length of time. (*Id*.).

At the administrative hearing on October 23, 2013, Plaintiff testified that she was unable to work due to severe anxiety and panic attacks that caused her to leave in the middle of her job.

7

(R. 45, 51). She described her panic attacks, which occur multiple times a day, as follows: "[m]y heart starts racing really bad. I can't breathe. I need to leave whatever situation I'm in - - if I'm able to. I start shaking. I cry . . . I feel, like, everything is closing in on me. It feels, like, you're having a heart attack. It's a terrible feeling." (R. 53). These attacks are triggered by being out of her home. (*Id.*) She also testified about suffering from bipolar disorder that caused manic and depressive phases. In a depressive phase, Plaintiff had suicidal thoughts, and engaged in self-mutilating behavior. (R. 53-54). In a manic phase, Plaintiff did not sleep for days on end. Dr. Lirag prescribed Tegretol, Xanax and Ambien, but Plaintiff testified that the medications did not work. (R. 54-55).

### III. ALJ'S DECISION

In his November 15, 2013, disability decision, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since May 15, 2011, the alleged onset date. (R. 27).

At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease, arthritis, obesity, anxiety, depression, and a history of polysubstance abuse. (*Id.*).

At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that satisfied the criteria of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*). The ALJ expressly considered, *inter alia*, the listings in sections 1.04 (pertaining to disorders of the spine) and section 12.00 (pertaining to mental disorders).

The ALJ then found at step four that Plaintiff had the following Residual Functional Capacity ("RFC"):

8

> [C]laimant has the residual functional capacity to perform light to sedentary work a defined in 20 CFR 404.1567(b) and 416.967(b) except she should be able to sit/stand as needed. Mentally, she is limited to unskilled work, should have no interaction/transactions with the public. Also, that the stress, concentration and attention demands do not exceed moderate limits as defined by Social Security and it's [sic] mental residual functional capacity format, and would not be limited satisfactory in that, she would not be distracted more than 10 percent of the workday or workweek.

(R. 29). He found that Plaintiff is unable to perform her past relevant work as a cashier or support nurse's aide. (R. 32).

The ALJ then proceeded to step five, and determined, based on the testimony of the VE, that there existed other jobs in the national economy that Plaintiff was able to perform despite her RFC. (R. 33). Accordingly, the ALJ reached step five of the disability determination and concluded that Plaintiff was not disabled under the Act.

## IV.   LEGAL STANDARD

To receive DIB or SSI benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Act requires that a claimant for disability benefits show that she has a physical or mental impairment of such a severity that:

> [S]he is not only unable to do his previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work.

9

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  A five-step sequential evaluation process is used to determine eligibility for disability benefits.[5]  The claimant bears the burden of establishing steps one through four, and then the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the national economy, in light of her age, education, work experience, and RFC.  *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

Judicial review of a denial of disability benefits is limited to determining whether there is substantial evidence to support the Commissioner's decision.  *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)

---

[5]  The Commissioner uses the same five-step process to determine whether a claimant is disabled in both SSI and DIB cases.  *See* 20 C.F.R. §§ 404.1520 (DIB), 416.920 (SSI).  The steps are as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If he [or she] is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits his [or her] physical or mental ability to perform basic work activities.  If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of the impairment listed in the "listing of impairments," . . . which result in a presumption of disability, or whether the claimant retains the capacity to work.  If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform his past work.  If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000).

(quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Substantial evidence is a deferential standard, requiring "less than a preponderance" and only "more than a mere scintilla."  *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).  When the conclusion of the ALJ is supported by substantial evidence, the Court is bound by those findings even if it would have decided the factual inquiry differently.  *Fargnoli v. Massanari,* 247 F.3d 34, 41 (3d Cir.2001).  However, the Commissioner must provide an explanation for rejecting pertinent or probative evidence.  While a court may not reweigh the evidence, it may evaluate the basis for the ALJ's decision.  *Horst v. Comm'r of Soc. Sec¸* 551 F.App'x 41, 45 (3d Cir. 2014); *Cotter v. Harris*, 642 F.2d 700, 704–05 (3d Cir.1981) ("[A]n explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper.").

## V.   DISCUSSION

The ALJ has a duty to evaluate all relevant evidence in the record.  *Fargnoli,* 247 F.3d at 41; *Burnett v. Comm'r of Soc. Sec.,* 220 F.3d 112, 121 (3d Cir.2000); *Rivera*, 9 F. Supp. 3d at 502.  To facilitate meaningful judicial review, the ALJ must explain clearly and fully the basis of his decision.  *Barren Creek Coal Co. v. Witmer,* 111 F.3d 352, 356 (3d Cir.1997) (quoting *Cotter,* 642 F.2d at 704–05).  The ALJ must discuss what evidence supports his determination, what evidence he rejected, and his reasons for accepting some evidence while rejecting other evidence.  *Diaz v. Comm'r of Soc. Sec.,* 577 F.3d 500, 505–06 (3d Cir.2009); *Cotter,* 642 F.2d at 705–06.  Otherwise, the reviewing court cannot determine whether significant probative

evidence was improperly rejected or ignored. *Burnett,* 220 F.3d at 121; *Cotter,* 642 F.2d at 706–07.

Here, Plaintiff contends that the ALJ erred in finding that she "retained the residual functional capacity to perform a range of unskilled sedentary and light work." (Pl.'s Br. 1). Specifically, she argues that the ALJ failed to properly evaluate the medical evidence by disregarding the opinion of her treating doctor, (*id.* at 4-9), ignoring multiple GAF scores, (*id.* at 9-11), and discrediting Plaintiff's subjective complaints related to her mental impairments, (*id.* at 11-14). The Commissioner responds that the ALJ appropriately considered Plaintiff's mental health treatment record, and that substantial evidence supports his weighing of the medical and opinion evidence in support of the ultimate RFC determination. (Resp. 5-12). I find the Plaintiff's arguments persuasive.

### A. Weight of the Medical Opinions

Opinions from treating sources are generally given more weight than opinions from other sources. 20 C.F.R. § 416.927(c)(2). In fact, so long as a treating source's opinion is "well-supported" and "not inconsistent with the other substantial evidence," it is given "controlling weight." *Fargnoli*, 247 F.3d at 43 (citing 20 C.F.R. § 404.1527(d)(2)); *see also Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008); *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). The ALJ may not "reject evidence for no reason or for the wrong reason." *Rutherford v. Barnhart,* 399 F.3d 546, 554 (3d Cir.2005) (quoting *Mason v. Shalala,* 994 F.2d 1058, 1066 (3d Cir.1993)). In rejecting or giving less weight to a treating physician's opinion, the ALJ must adequately explain his reasons for doing so and make a clear and satisfactory record. *See Kent v. Schweiker,* 710 F.2d 110, 115 (3d Cir.1983); *Fargnoli,* 247 F.3d at 43–44 (citing *Burnett,* 220 F.3d at 121).

Here, the ALJ assigned little weight to the opinion of Dr. Lirag, and "great weight" to Dr. Gold, the state agency consultant, stating:

> Enrique Lirag, M.D., completed a medical source statement indicating that the claimant's coping strategy is to withdraw rather than engage in confrontation [for] fear she might seriously hurt somebody. He noted she is incapable of even "low stress" jobs. She would like be absent more than 3 times a month due to symptoms and/or treatment. This opinion is not well supported in the record and is therefore, given less weight.
>
> The State agency [psychological consultant] assessed that the claimant could perform work despite her impairments. [This opinion] is given great weight.

(R. 32) (citations omitted). The opinion contains no other explanation for the weight afforded the contradictory medical opinions.

As explained above, Plaintiff's medical records document major depressive disorder, bipolar and anxiety disorder, detail her history of mental health diagnoses, and indicate that despite medication, Plaintiff continued to experience anxiety, disordered sleep, manic and depressive episodes, social isolation, irritability, crying spells, and vague suicidal ideation and thoughts of hurting others. (R. 237, 241, 243, 245, 247, 253-54). The ALJ does not address these documented findings or explain why he credited the opinion of the non-examining agency consultant over the treating psychiatrist. The cursory discussion provided by the ALJ "makes it impossible for us to review the [decision], for we cannot tell if significant probative evidence was not credited or simply ignored." *Fargnoli*, 247 F.3d at 42 (citations omitted). Accordingly, more extensive treatment of these issues is necessary to facilitate judicial review. *See Gross v. Comm'r Soc. Sec.*, No. 15-2764, 2016 WL 3553259, at *4 (3d Cir. June 30, 2016); *Fargnoli*, 247 F.3d at 42 ("Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided."); *Edwards v. Colvin*,

13

No. 14-4235, 2015 WL 4545391, at *3–5 (E.D. Pa. July 28, 2015) (remand necessary where the ALJ analysis fails to sufficiently justify the rejection of treating physician opinion and thus, court without necessary information to determine whether ALJ decision supported by substantial evidence).

      **B.**      **GAF Scores**

There is no bright-line rule that a case must be remanded if the ALJ failed to mention a specific GAF score. *Miller v. Colvin¸* No. 14-6378, 2016 WL 3450159, at *5-7 (E.D. Pa. June 17, 2016). However, the ALJ must conduct a "thorough analysis of the medical evidence regarding plaintiff's mental impairments." *Rivera*, 9 F. Supp. at 506-07. In other words, even if the ALJ did not specifically mention an actual GAF number, he has provided "good reasons" for discounting the GAF score if he adequately explained why he discounted the whole of the source's opinion. *Nixon v. Colvin,* No. 14-4322, 2016 WL 3181853, at *3 (June 7, 2016).

Here, Plaintiff received three different GAF scores of 50 from her treating psychiatrist, Dr. Lirag, between April 2012 and June 2013, (R. 424, 781, 799), and a fourth GAF score of 42 given by LVCHC therapist Rana Dimmig on April 11, 2012. (R. 421). The ALJ did not discuss any GAF scores in his opinion, nor does the opinion discuss in any meaningful way Plaintiff's mental impairments and the voluminous medical records that document her mental health diagnoses. As such, nothing in the opinion assures this Court that the ALJ conducted the detailed analysis of Plaintiff's mental impairments necessary to properly address the issues upon which the GAF scores are based. Therefore, the matter should be remanded on this basis. *See Irizarry v. Barnhart*, 233 F. App'x 189, 192 (3d Cir. 2007) (remanding where an ALJ not only failed to mention GAF scores, but also "omit[ted] any discussion of" the medical opinions containing those scores) (non-precedential).

### C.      Plaintiff's Credibility

It is well established that an ALJ is required to "give serious consideration to a claimant's subjective complaints of pain [or other symptoms], even where those complaints are not supported by objective evidence." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993) (citing *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985)).  Where medical evidence supports a claimant's complaints, the "complaints should then be given 'great weight' and may not be disregarded unless there exists contrary medical evidence." *Id*. at 1067–68 (quotations omitted).  The ALJ "has the right, as the fact finder, to reject partially, or even entirely, such subjective complaints if they are not fully credible."  *Weber v. Massanari*, 156 F.Supp.2d 475, 485 (E.D. Pa. 2001) (citing *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974)).  However, the ALJ's "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Schwartz v. Halter*, 134 F. Supp. 2d 640, 654 (E.D.Pa. 2001); *see also* Social Security Ruling ("SSR") 96–7p[6]; *Schaudeck v. Comm'r of Soc. Sec. Admin*., 181 F.3d 429, 433 (3d Cir. 1999).  The ALJ must explain his basis for rejecting a claimant's subjective testimony.  *Sturgill v. Colvin*, No. 15-1195, 2016 WL 4440345, at *8 (E.D. Pa. Aug. 23, 2016).

---

[6] Pursuant to SSR 96-7p, an ALJ must assess Plaintiff's credibility by considering objective medical evidence and (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  SSR, 96-7p, 3; 20 C.F.R. § 404.1529(c)(3).

Here, the ALJ found Plaintiff was not fully credible with regard to the degree of impairment caused by her mental conditions:

> Regarding credibility, the claimant has been able to control her behavior when she is being treated by medical staff. She has given inconsistent statements regarding her polysubstance use. She reported, during her April 2012 session at Lehigh Valley Community Health, that she used marijuana in March 2012. The overall evidence does not support the claimants' subjective complaints. The evidence does not support limitations that would preclude all work activity.

(R. 32) (citations omitted). The ALJ provided no additional support for this general finding. He did not discuss the medical opinions of Dr. Lirag or Dr. Gold. Other than noting the perception of the Disability Office field staff that Plaintiff appeared able to control herself and pointing to Plaintiff's testimony regarding marijuana use, the ALJ did not explain which evidence he gave little weight to, and why. Accordingly, remand is recommended for the ALJ to clarify why Plaintiff's subjective complaints are not entitled to greater weight. *See Gross*, 2016 WL 3553259, at *5.

## VI.    CONCLUSION

After careful review of the ALJ's decision, the administrative record, and the parties' arguments, I find the ALJ erred by failing to explain the weight afforded to the medical evidence, and the reasons for discounting Plaintiff's subjective complaints related to her mental impairments. Accordingly, I respectfully recommend that Plaintiff's request for review be granted, and this matter be remanded to the ALJ for further evaluation consistent with this opinion. Therefore, I make the following:

**RECOMMENDATION**

AND NOW, this  21ST  day of September, 2016, it is RESPECTFULLY RECOMMENDED that Plaintiff's request for review be GRANTED, as set forth herein.

BY THE COURT:


  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
UNITED STATES MAGISTRATE JUDGE